Barbara SHEGOG, et al., Plaintiffs–Appellants,

v.

BOARD OF EDUCATION OF THE CITY OF CHICAGO, et al., Defendants–Appellees.

No. 99–1430.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1999.

Decided Oct. 18, 1999.

Wayne B. Giampietro (argued), Witwer, Poltrock & Giampietro, Chicago, IL, for Plaintiffs–Appellants.

Robert S. Markin (argued), Russ M. Strobel, Jenner & Block, Chicago, IL, for Defendants–Appellees except Kenosha County.

Robert S. Markin (argued), Jenner & Block, Chicago, IL, Anna M. Pepelnjak, Crivello, Carlson, Mentkowski & Steeves, Milwaukee, WI, for Defendant–Appellee Kenosha County.

Before CUDAHY, COFFEY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Illinois revamped its School Code in 1995, and some of the changes adversely affected existing teachers. A surprisingly large volume of litigation about these changes has landed in federal court, although the teachers' principal objections concern the meaning of the state law. See, e.g., *Hearne v. Chicago Board of Education*, 185 F.3d 770 (7th Cir.1999); *Pittman v. Chicago Board of Education*, 64 F.3d 1098 (7th Cir.1995). Plaintiffs in our case, eight former teachers, contend that they were let go in violation of statutes establishing tenure. The School District concedes that the teachers had tenure, and 105 ILCS 5/34–85 says that a tenured teacher "shall not be removed except for cause." Chicago also concedes that it lacks "cause" to remove any of the plaintiffs. Nonetheless, the School Board relies on 105 ILCS 5/34–18(31), part of the 1995 package, which authorizes the School Board to "promulgate rules establishing procedures governing the layoff or reduction in force of employees and the recall of such employees."

Taking advantage of this power, Chicago adopted a policy under which tenured teachers are laid off when a school closing, drop in enrollment, change in a school's educational focus, or "remediation, probation, reconstitution or educational crisis" justify that step. Full pay and benefits continue for ten months after layoff to afford the teacher an opportunity to find a position at another school. If that time passes without success, the pay and benefits cease, though the teacher retains some reinstatement rights by virtue of seniority. Our eight plaintiffs were laid off under the new policy and did not find positions within ten months. (The Chicago Teachers' Union is a ninth plaintiff; what legal interest it has in this suit is a mystery, but not one we need to unravel.) Plaintiffs asked the district court to issue a preliminary injunction requiring the School District to continue their pay and benefits even though they were performing no work.

After exploring the interactions among provisions in the old and new school laws, the district court decided that § 5/34–18(31) probably modifies the tenure rights otherwise established by state law, making the Board's decision substantively proper. The judge therefore declined to afford preliminary relief, although he held open the possibility that on further reflection he would reach a different conclusion about the meaning of state law. Plaintiffs immediately appealed under 28 U.S.C. § 1292(a)(1).

 What is this suit doing in federal court? All of the parties are citizens of Illinois, so 28 U.S.C. § 1332 can't be the source of jurisdiction, and because the only issue addressed in the district court was one of Illinois law we had substantial doubts about federal-question jurisdiction under § 1331. Before oral argument, therefore, we directed the parties to file supplemental briefs discussing the source, if any, of subject-matter jurisdiction. *Pittman* holds that statutes modifying the terms of teachers' job security do not transgress any substantive constitutional limitation. 64 F.3d at 1103–05. When tenure is simply an outcome of a statute requiring cause for discharge, it disappears when the statute is amended. *Pittman* considered and rejected the possibility that the statutes requiring cause for discharge in Illinois created individual contracts that are immune from legislative alteration. Although *Pittman* dealt with principals, its conclusions are equally applicable to teachers. Anyway, thinking of tenure as a contractual rather than a statutory entitlement would not supply jurisdiction. "[T]he due process clause does not require, or even permit, federal courts to enforce the substantive promises in state laws and regulations.... If a state's violation of its own laws and regulations does not violate the due process clause, it is hard to see how failure to keep a promise contained in a contract can violate the due process clause." *Mid–American Waste Systems, Inc. v. Gary*, 49 F.3d 286,

290 (7th Cir.1995). People who contend that a state actor has violated state law or broken a contract must present their claims to state court. See also *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984): "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law".

■ Responding to our order, plaintiffs insisted that their claim arises under the due process clause of the fourteenth amendment, and thus that 28 U.S.C. § 1331 and § 1343(a)(3) supply jurisdiction, because tenure is a property right, which they hold unless the School District offers notice and an opportunity for a hearing at which "cause" for discharge can be established. Yet whether 105 ILCS 5/34–18(31) modifies 105 ILCS 5/34–85 is a legislative rather than an adjudicative issue; the School District need not offer person-by-person hearings on that question. *Atkins v. Parker*, 472 U.S. 115, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985); *Bi–Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915); *Youakim v. McDonald*, 71 F.3d 1274, 1291 (7th Cir.1995). If the School District is right about the meaning of state law, there will be no hearing to establish "cause." Likewise if plaintiffs are right about the meaning of state law, for the School District does not contend that it has "cause." No matter how the state-law issue comes out, then, no hearing is in prospect.

■ This situation is unlike *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and other cases in which an issue of state law set the stage for a constitutional claim. In *Bishop* and *Roth*, resolving the state-law issue one way would mean that the plaintiff had a property interest, which would lead to a hearing under the due process clause; resolving the state-law issue the other way would negate the existence of property and defeat plaintiff's demand for a hearing. By contrast, the Chicago teachers will not receive a hearing on "cause" whether they win or lose on the state-law issue. Plaintiffs did not ask the district judge to order Chicago to hold hearings; they asked the district judge to order the School Board to keep them on the payroll, a substantive rather than procedural demand. This suggests that their due-process theory is just decoration, rather than an element of a well-pleaded complaint. See *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986); *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). When the parties agree about the meaning and application of federal law and disagree only about the meaning of state law, then the complaint does not "arise under" federal law; any other approach would open the door to collusive allegations of jurisdiction. Cf. 28 U.S.C. § 1359.

One aspect of this suit fits the *Bishop–Roth* mold, however. Plaintiffs contend that they are entitled to hearings even if 105 ILCS 5/34–18(31) modifies 105 ILCS 5/34–85, and even if the Board's new procedure is valid. For then the propriety of a layoff would depend on whether there had been a decline in enrollment, a change in a school's educational focus, or "remediation, probation, reconstitution or educational crisis" that required a layoff. These are potentially person-specific issues affecting "property" interests (that is, legitimate claims of entitlement based on contestable factual propositions, see *Upadhya v. Langenberg*, 834 F.2d 661 (7th Cir.1987)) to be resolved at hearings. Similarly, whether a particular teacher has found a new position within ten months is the sort of question on which notice and an opportunity to be heard could be useful. Whether 105 ILCS 5/34–18(31) or the Board's regulations create property interests within the meaning of the due process

clause is a question of federal law. So we are satisfied that the district court had subject-matter jurisdiction. State-law claims then could be entertained under the supplemental jurisdiction. 28 U.S.C. § 1367. This understanding of which claims arise under federal law, and which under state law, nonetheless may affect the proper handling of the case, for reasons we take up presently.

■ Plaintiffs' quest for salary and benefits pending further decision by the district court runs head on into the principle that a temporary deprivation of employment does not inflict irreparable injury, and therefore does not justify a preliminary injunction. See *Sampson v. Murray*, 415 U.S. 61, 89–92, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). The Court observed in *Sampson* that any diminution of income can be redressed by damages (plus prejudgment interest) at the conclusion of the case. What is more, plaintiffs do not complain about the layoffs; they complain only about the cessation of salary and benefits ten months later. Their demand is strictly for money. The *only* injury in a case such as ours is financial. Because plaintiffs were not discharged for "cause," none of the teachers suffered a reputational injury—though *Sampson* added that the defamation implicit in a discharge for cause may be cured by a favorable decision at the end of the case more effectively than by interlocutory relief (which, although it comes sooner, is tentative and therefore does less to rehabilitate a reputation).

*Hetreed v. Allstate Insurance Co.*, 135 F.3d 1155, 1158 (7th Cir.1998), observed that, when deciding whether to grant interim relief, a judge must compare the costs of false negatives (the injury caused by wrongly denying relief to someone who ultimately prevails on the merits) against the costs of false positives (the injury caused by wrongly granting relief to a plaintiff who ultimately loses the case). Damages at the end of the case compensate plaintiffs for any false negatives at the interlocutory stage. False positives,

though, can create substantial and irreversible costs. Few employees have the wealth to post an injunction bond that could compensate the employer for salary received pending final decision; our eight teachers do not propose to return their salary if they should lose in the end. Because the potential loss from false positives exceeds the loss from false negatives in cases of this kind, it would take a very powerful showing on the merits (implying that the costs of false positives are negligible) to justify reinstatement while the case is ongoing. Many of our cases, of which *Hetreed* and *Webb v. Ball State University*, 167 F.3d 1146 (7th Cir.1999), are only the most recent, hold that interlocutory reinstatement in employment cases should be rare, if that remedy ever is appropriate. *Roth v. Lutheran General Hospital*, 57 F.3d 1446, 1453 (7th Cir.1995); *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121 (7th Cir.1983); *Ciechon v. Chicago*, 634 F.2d 1055, 1057–58 (7th Cir.1980); *EEOC v. Janesville*, 630 F.2d 1254, 1259 (7th Cir. 1980). Plaintiffs ask us to distinguish *Hetreed* and *Webb* but do not mention *Sampson*, their most formidable obstacle, or any of our pre-*Hetreed* decisions. These teachers, just like the plaintiffs in *Sampson*, *Hetreed*, and *Webb*, can receive complete relief in the final judgment; there is no justification for interim remedies that may impose uncompensated costs on the School District. We affirm the district court's decision on this alternative ground, without expressing any view about the relation between § 5/34–85 and § 5/34–18(31).

It should be possible for federal judges to maintain this agnostic position indefinitely. Obligations of public bodies under state law should be determined by state courts unless there is a very good reason why the federal court should intervene. See, e.g., *International College of Surgeons v. Chicago*, 153 F.3d 356, 366 (7th Cir.1998); *Van Harken v. Chicago*, 103 F.3d 1346, 1354–55 (7th Cir.1997). No such reason is apparent in this case: the

plaintiffs' only *bona fide* claim under federal law supposes that the defendants' view of state law is correct, so it is easy to avoid decision of the main state-law issue. One way to avoid an unnecessary federal decision on a question of state law that vitally affects the operation of a state or local public agency is to certify that issue to the state's highest court. See *Arizonans for Official English v. Arizona,* 520 U.S. 43, 76–80, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). Certification may present the question in a needlessly abstract way, however, or short-circuit the normal process of decision by the state's intermediate appellate courts. It is therefore preferable to allow litigation to take its natural course through the state courts. That is readily accomplished.

Instead of returning to the state-law issue, the district court now should address the claim that justifies this suit's presence in federal court. If the judge concludes that it is sound, he should provide appropriate relief and then either relinquish supplemental jurisdiction, see 28 U.S.C. § 1367(c)(3), or defer further proceedings until the state courts have had an opportunity to address the main state-law question. If the judge concludes that the federal theory is not sound, then he should swiftly terminate the case and remit the plaintiffs to whatever remedies they have in state court.

Allowing plaintiffs to file a new suit there, once their federal claim has been resolved, would permit the state courts to resolve the state-law issue. A stay would have much the same effect, for another group of teachers has filed suit in state court, making the same principal arguments as our plaintiffs. One is tempted to suppose that the Chicago Teachers' Union is behind both suits, expecting that all teachers will benefit if either group prevails. If the federal court rules in favor of the teachers, then other teachers will seek to bind the School District using offensive non-mutual issue preclusion. But if our eight teachers lose the federal case, then others press on in state court; and if they win, the result will again benefit all teachers, for the ruling of state tribunals on an issue of state law is conclusive, even though a federal court may have made a contrary guess about what the state courts would do. Two chances are better than one from the teachers' perspective, but this is not a stratagem that federal courts should abet. The School Board itself is surprisingly complaisant: it asked the state court to stay proceedings while the federal litigation proceeds. But the questions of state law presented by this case must in the end be resolved by state judges, and what is left of this suit after the only real due-process claim has been resolved should be handled to ensure that the right forum makes the ultimate decision.

AFFIRMED AND REMANDED