In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2858

KELI CALDERONE,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cv-07866 — **Thomas M. Durkin**, *Judge.*

ARGUED SEPTEMBER 15, 2020 — DECIDED NOVEMBER 5, 2020

Before FLAUM, ROVNER, and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* Caught in a fit of road rage, Keli Cal-
derone shot another driver with her handgun. An Illinois
grand jury subsequently indicted her for attempted murder.
Calderone's employer—the City of Chicago ("the City")—ad-
ministratively charged her for violating its personnel rules. At
her later criminal bench trial, Calderone argued self-defense;
an Illinois judge agreed and acquitted her. Soon thereafter, the
City reinstated Calderone.

Calderone then sued the City and her supervisors in federal court, claiming, among other things, that the City fired her in retaliation for her exercise of her Second Amendment rights. The City moved to dismiss the claims, arguing that Calderone's conduct was not within the scope of activity protected by the Second Amendment. The district court granted the motion, reasoning that even if Calderone does have a constitutional right to discharge her firearm in self-defense, qualified immunity shielded her supervisors from suit because caselaw has not clearly established that right. We affirm the district court on the sole ground that Calderone's supervisors are entitled to qualified immunity.

## I. Background

### A. Facts

Keli Calderone is a police communications operator at the City of Chicago's Office of Emergency Management and Communications ("OEMC"). On July 19, 2017, Calderone was off duty and out driving her car. While idling alongside Calderone at a red light, motorist Selene Garcia threw a drink into Calderone's vehicle and then pulled to the side of the road. Calderone followed Garcia and stopped right behind Garcia's car.

Both Calderone and Garcia exited their cars and argued. After a minute or so, Garcia returned to her vehicle and tried to drive away. Calderone, however, stood in front of Garcia's car, thus barring any exit. When Garcia attempted to drive around Calderone, Calderone moved to stop her. Garcia again got out of her vehicle. She pushed Calderone several times, eventually grabbing Calderone by the hair and throwing her to the ground. Calderone then shot Garcia with her

handgun, which she was legally permitted to carry on her person.

Police officers subsequently arrived on the scene, where they arrested Calderone. As for Garcia, the bullet lacerated several of her vital organs, including her heart. Doctors later removed portions of Garcia's liver, pancreas, and gallbladder, as well as one kidney. Garcia was hospitalized for several months because of those injuries. The bullet remains lodged near Garcia's spine because it is too dangerous to remove.

An Illinois grand jury indicted Calderone for attempted murder in August 2017. Following the initiation of Calderone's criminal case, the City administratively charged her with violation of Personnel Rule XVIII, Section 1, Subsections 15, 23, and 50:

> On or about July 19, 2017 at approximately 3458 South Ashland Avenue in Chicago, Illinois, you, in committing a battery, knowingly discharged a firearm, other than a machine gun or a firearm equipped with a silencer, and caused any injury to another person, to wit: you shot Selene Garcia about the body. In doing so, you violated 720 ILCS 5/12-3.05(e)(1) ("Aggravated Battery – Offense Based on Use of a Firearm") and City of Chicago Personnel Rule XVIII, Section 1, Subsection 15.

> On or about July 19, 2017 at approximately 3458 South Ashland Avenue in Chicago, Illinois, you discharged a firearm and caused injury to another person, to wit: you shot Selene Garcia

> about the body. In doing so, you engaged in dis-
> courteous treatment, including verbal abuse, of
> any other City employee or member of the pub-
> lic, in violation of City of Chicago Personnel
> Rule XVIII, Section 1, Subsection 23.
>
> Based on the foregoing actions, you engaged in
> conduct unbecoming a City of Chicago em-
> ployee, in violation of City of Chicago Personnel
> Rule XVIII, Section 1, Subsection 50.

Calderone's principal response to the charges was that the shooting constituted "self-defense with a lawful firearm," a response she feels the City "entirely disregarded."

OEMC's Deputy Director of Legal/Labor, Tenaya Williams, informed Calderone that OEMC was seeking Calderone's termination. The City then held a pre-termination hearing. Calderone characterizes this hearing as a "sham … pervaded by negative animus [and] hype from negative press about the shooting, [and] hype and bias and concern based on unrelated police shootings such as the Van Dyke case." After the hearing, OEMC's Executive Director, Alicia Tate-Nadeau, fired Calderone, effective December 6, 2017. Calderone asserts the City did not respond to her claim that the discharge was in self-defense and instead relied "exclusively on the arrest reports" and "the video of the incident."

In October 2018, the Illinois state court held a bench trial on Calderone's attempted murder charge. The trial judge acquitted Calderone based on self-defense. The court stated that Garcia was the "original aggressor" because she had "le[ft] her vehicle first" and "ma[de] bodily contact with" Calderone. The court found Calderone had shot Garcia after she

had been pushed to the ground, which left Calderone "in a vulnerable position to be further injured and subjected to additional great bodily harm." Accordingly, the court concluded that the shooting of Garcia was justified. The City subsequently reinstated Calderone. An arbitrator presided over a hearing to determine back pay owed to Calderone.

Calderone sued the City, Williams, and Tate-Nadeau in federal court. She alleges that her termination deprived her of her Second Amendment right to keep and bear arms. Calderone cited *District of Columbia v. Heller*, 554 U.S. 570 (2008), and more importantly, *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), for the proposition that she has a Second Amendment right to use her gun in self-defense. Calderone also alleged that the City deprived her of property and liberty rights without due process, and that the City Personnel Rules were void-for-vagueness (or overbroad).

The district court dismissed all of Calderone's claims. The court reasoned that *Heller* and *Moore* only hold that there is a right to *possess* a gun—but not a distinct right to *use* a gun—for self-defense. The court explained that the Second Amendment leaves the question of whether an actual use of a gun constitutes self-defense to criminal and tort law. The court also ruled that Williams and Tate-Nadeau were entitled to qualified immunity because the Second Amendment does not clearly establish a right to use a gun in self-defense, if it encompasses such a right at all. Finally, the court concluded that Calderone did not allege the City's "extensive grievance and arbitration procedures" fell short of constitutional commands. Moreover, Calderone received notice of the charges,

an explanation of the evidence (at her hearing), and an opportunity to respond. The court viewed Calderone's allegation that bias infected this process as "conclusory."

Calderone appealed.

## II. Discussion

We review de novo a district court's grant of a motion to dismiss for failure to state a claim. *Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1060 (7th Cir. 2020). "We accept well-pleaded facts as true and draw all reasonable inferences in the plaintiff['s] favor." *Id.* at 1060–61. To withstand a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Calderone challenges the district court's dismissal of her Second Amendment retaliation claims against her supervisors and the City. She asserts (among other arguments) that the individual supervisors do not deserve qualified immunity because *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), clearly established the right to use a gun in self-defense. She also argues that the City should be liable under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). Finally, Calderone challenges the district court's dismissal of her procedural due process claim. We turn first to the Second Amendment retaliation claims. Then, we address Calderone's procedural due process claim.

**A. Second Amendment**

The Second Amendment to the Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has interpreted the Second Amendment to "guarantee the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Calderone alleges that the City, through her supervisors, fired her for exercising her Second Amendment right to use a firearm in self-defense. The district court, however, concluded that Calderone's supervisors were protected by qualified immunity and the City was not liable under *Monell*. Because Calderone's retaliation claims cannot survive if her supervisors are entitled to qualified immunity and *Monell* does not apply, we address these issues first.

1. *Qualified Immunity*

Public officials enjoy immunity from civil liability for conduct that "[1] does not violate [2] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because prong two—the requirement that there be a clearly established right—is dispositive in this case, we will begin with prong two and dispense with prong one—whether the City's conduct amounts to a constitutional violation. *See Siddique v. Laliberte*, 972 F.3d 898, 903 (7th Cir. 2020) (utilizing

same approach). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (citation and internal quotation marks omitted).

The district court correctly held that the individual defendants are immune from Calderone's Second Amendment claim. Calderone argues "there is absolutely a clearly-established right to carry and possess a firearm for self-defense in this jurisdiction." However, the defendants did not fire Calderone for possessing a firearm in self-defense; they "fired her for shooting Selene Garcia about the body." Therefore, Calderone must demonstrate there is a clearly established right to discharge a gun under these circumstances, not to simply possess a gun in public.

In *Heller*, the Supreme Court held "that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." 554 U.S. at 635. In *Moore*, we invalidated an Illinois law that effected a near total ban on handgun possession for self-defense outside the home. 702 F.3d at 942.

Calderone insists that *Moore* clearly establishes her right to shoot someone in self-defense. The statute we struck down in *Moore* prohibited public carry, as apart from public use, of a firearm. *Id.* Carriage and use are separate and distinct interests under the Second Amendment. *See, e.g., McDonald v. City of Chicago*, 561 U.S. 742, 890 n.33 (2010) (Stevens, J., dissenting) ("The Second Amendment right identified in *Heller* is likewise clearly distinct from a right to protect oneself.") Simply put,

in *Moore* we were not presented with the issue of when the Second Amendment protects the discharge of a gun.

Moreover, the parties have not provided—nor have we located—a single decision considering the circumstances in which discharging a firearm constitutes self-defense for purposes of the Second Amendment. Lacking any discernible standard, the scope of the right remains a matter of first impression. Qualified immunity is particularly appropriate in this situation. *See Moss v. Martin*, 614 F.3d 707, 712 (7th Cir. 2010); *Glass v. Dachel*, 2 F.3d 733, 745 (7th Cir. 1993) ("If the defendants show an issue of first impression, we tend to cloak the government with qualified immunity.").

Furthermore, judicial restraint counsels in favor of bypassing the constitutional question presented. *See Pearson*, 555 U.S. at 237 (encouraging courts to work around constitutional questions if there is a risk of prematurely and incorrectly deciding them because the briefing is inadequate); *Jaxson v. Saul*, 970 F.3d 775, 777 (7th Cir. 2020) ("Constitutional adjudication is supposed to be a last resort, after all other grounds have been explored."). The parties have not adequately briefed the contours of the right Calderone asserts, namely, (1) the circumstances under which a gun may be discharged in self-defense under the Second Amendment, or (2) whether such a right applies to Calderone's conduct. Calderone did not propose the contours of the right beyond her general assertion that *Moore* means it exists. On appeal, the City argued the "right to armed self-defense codified in the Second Amendment is limited to the two narrow forms of common-law self-defense recognized when that Amendment was adopted" and that "Calderone was not engaged in either of the two nar-

row forms of self-defense falling within the scope of the Second Amendment." However, the City did not raise either argument at the district court below. "In civil litigation, issues not presented to the district court are normally forfeited on appeal." *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 308 (7th Cir. 2010); *see also Walker v. Weatherspoon*, 900 F.3d 354, 357 (7th Cir. 2018) ("Enforcing waivers and forfeiture gives litigants incentives to explore issues themselves rather than wait for the court to do the work."), *cert. denied*, 139 S. Ct. 832 (2019). The prudent approach, therefore, is to decline to address whether Calderone's supervisors violated her constitutional rights.

Calderone broadly declares that "there is absolutely a clearly established right to carry and possess a firearm for self-defense" under the Second Amendment. The Supreme Court has repeatedly cautioned us to not identify a constitutional right at too high a level of generality. *See, e.g., Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Otherwise, plaintiffs could "convert the rule of qualified immunity … into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson v. Creighton*, 438 U.S. 635, 639 (1987). At the proper level of generality, just about the only thing that is clear about this case is that existing precedent did not establish whether Calderone's shooting of Garcia was constitutionally protected. The individual defendants are immune from suit on the Second Amendment claim.

### 2. *Monell*

Next, we move to Calderone's *Monell* claim that "the City has three express policies that it applied to Calderone that violated her Second Amendment [right] to carry a firearm for

self-defense, specifically Subsections 15, 23, and 50." The district court concluded that Calderone did not sufficiently "allege that the City has any policy, practice, or custom requiring termination for exercise of Second Amendment rights." We agree.

To ultimately prove a *Monell* claim, a plaintiff must have evidence of: "(1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020) (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404–07 (1997)). We assume, without deciding, an underlying constitutional violation. *See, e.g.*, *Word v. City of Chicago*, 946 F.3d 391, 395 (7th Cir. 2020). The City does not contest that it acted under its policy, that is, its personnel rules. Accordingly, the parties debate the second and third elements of the *Monell* claim: culpability and causation. The pivotal question is "always whether an official policy, however expressed …, caused the constitutional deprivation." *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc); *see also J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020) (en banc), *petition for cert. filed* (U.S. Oct. 2, 2020) (No. 20-427).

Calderone does not appear to argue that the relevant personnel rules facially violate the Second Amendment rights of City employees; rather, Calderone contends that, as applied to her, the rules violate her Second Amendment rights. Calderone also appears to accept that the text of the personnel rules she relies on does not explicitly forbid an employee from discharging a firearm in self-defense. Rightly so, because all

these rules do is generally prohibit unlawful conduct, discourteous treatment of members of the public, and conduct unbecoming of a public employee.

But if, as Calderone argues, "it is the application of such policy that results in a constitutional violation," she has not carried her burden to demonstrate causation and culpability. A plaintiff may directly show these elements by "demonstrating that the policy is itself unconstitutional." *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010). Because Calderone cannot do so, she must indirectly show a "series of bad acts[,] creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Id.* (citation and internal quotation marks omitted); *see also Colbert v. City of Chicago*, 851 F.3d 649, 660 (7th Cir. 2017) (similar). Calderone does not satisfy this method of proof either. *See Jackson v. Marion Cnty.*, 66 F.3d 151, 152 (7th Cir. 1995) ("When this method of proof is used, proof of a single act of misconduct will not suffice; for it is the series that lays the premise of the system of inference.").

Calderone misreads *Calhoun v. Ramsey*, 408 F.3d 375, 379–80 (7th Cir. 2005), to suggest that she need only "one application of the offensive policy resulting in a constitutional violation … to establish municipal liability." As the City points out, in *Calhoun* we acknowledged in the sentence preceding the one Calderone quotes that a municipality is only liable in such circumstances assuming that one of its express policies facially violates the Constitution. *Id.* at 379; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an

existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Tapia v. City of Greenwood*, 965 F.2d 336, 339–40 (7th Cir. 1992) (same).

"But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation." *Tuttle*, 471 U.S. at 824 (footnotes and internal quotation marks omitted). One single incident cannot suffice; rather, Calderone must show "a series of constitutional violations." *Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000); *see also Hahn v. Walsh*, 762 F.3d 617, 636 (7th Cir. 2014) (reiterating standard); *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (same).

Here, Calderone identifies no other employee who suffered the Second Amendment injuries she purportedly has by enforcement of the City's personnel rules. *See Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019) (stating this kind of evidence can put a municipality on notice of the attendant risks of unconstitutionality). Without that evidence, she claims only that the application of the City's personnel rules resulted in her termination from municipal employment in violation of the Second Amendment. The single constitutional violation Calderone allegedly experienced cannot establish *Monell* liability in view of the City's facially constitutional personnel rules. The district court was right to dismiss this claim.

3.  *Retaliation*

Calderone alleges that the City, through her supervisors, fired her for exercising her Second Amendment right to use a firearm in self-defense. As discussed *supra*, however, the district court properly dismissed this claim on the grounds of qualified immunity and the absence of *Monell* liability. The Court therefore need not address Calderone's claim that her termination violated her Second Amendment rights, and the concomitant Second Amendment issues that claim raises. Furthermore, as noted above, judicial restraint counsels that we resolve this appeal on those grounds and decline to address Calderone's arguments on whether the conduct violated her constitutional rights. *See Bond v. United States*, 572 U.S. 844, 855 (2014) ("[I]t is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." (citation and internal quotation marks omitted)).

## B.  Procedural Due Process

Calderone claims that her termination also violated her constitutional right to procedural due process. "In analyzing a procedural due process claim, we follow a two-step process. First, we determine if the plaintiff has been deprived of a liberty or property interest. Second, we determine if the plaintiff was provided constitutionally sufficient process." *Knutson v. Vill. of Lakemoor*, 932 F.3d 572, 576 (7th Cir. 2019). The City concedes that it deprived Calderone of a constitutionally protected property interest in her public employment. "Thus, the only question is what—or how much—process was due for that deprivation." *Id.*

To determine the process due, "we must first determine whether the claim is based on established state procedures or on random and unauthorized acts by state employees." *Cannici v. Vill. of Melrose Park*, 885 F.3d 476, 479 (7th Cir. 2018). A claim based on random and unauthorized acts by state employees only requires a meaningful post-deprivation remedy, while a claim based on established state procedures requires the state to provide a pre-deprivation hearing, too. *Id.*

As the district court observed, Calderone specifically alleges that the individual defendants acted out of "negative animus" and "bias" against her. This is not a challenge to the disciplinary procedures prescribed by municipal law. Rather, Calderone readily admits that she describes a series of "random and unauthorized" departures from municipal law, resulting in the deprivation of her property interest in continued public employment. These "allegations of biased decisionmaking suggest only that [Calderone] may have suffered a random and unauthorized deprivation of [her] property interest in public employment." *Vargas v. Cook Cnty. Sheriff's Merit Bd.*, 952 F.3d 871, 873 (7th Cir. 2020); *see also Cannici*, 885 F.3d at 480; *Michalowicz v. Vill. of Bedford Park*, 528 F.3d 530, 535 (7th Cir. 2008) ("This species of due-process claim is a challenge to the 'random and unauthorized' actions of the state officials in question, i.e., to their unforeseeable misconduct in failing to follow the requirements of existing law.").

"In this instance, [Calderone] must avail herself of … post-deprivation remedies or demonstrate that the available remedies are inadequate." *Cannici*, 885 F.3d at 479 (citation and internal quotation marks omitted); *see also Vargas*, 952 F.3d at 873 ("An injury of that type is not a violation of due process

as long as the state offers adequate postdeprivation reme-dies.”). An inadequate remedy, for the purposes of due pro-cess, is a “meaningless or nonexistent” one. *Michalowicz*, 528 F.3d at 535 (internal quotation marks omitted); *see also Easter House v. Felder*, 910 F.2d 1387, 1406 (7th Cir. 1990) (en banc) (underscoring that the remedy must in no way “provide the due process relief guaranteed by the fourteenth amend-ment”). Conversely, an adequate post-deprivation remedy is one that is promptly able to restore the employee to her post. *See Simpson v. Brown Cnty.*, 860 F.3d 1001, 1010–11 (7th Cir. 2017).

Here, as the district court appreciated, a collective bar-gaining agreement with “extensive grievance and arbitration procedures” protected Calderone’s employment. Such proce-dures “can (and typically do) satisfy the requirements of post-deprivation due process.” *Chaney v. Suburban Bus Div. of Reg’l Transp. Auth.*, 52 F.3d 623, 630 (7th Cir. 1995); *see also, e.g., Hud-son v. City of Chicago*, 374 F.3d 554, 563 (7th Cir. 2004) (repeat-ing general rule). Calderone does not say that the grievance and arbitration procedures were meaningless. Quite the con-trary, the procedures were meaningful because they led to her reinstatement. *See Simpson*, 860 F.3d at 1010.

Calderone argues that “the collective bargaining agree-ment provides that only the Union and the Employer may submit a grievance to arbitration, which means precisely that Calderone herself had no access to a post-deprivation hear-ing.” But the Union represented Calderone and was bound by its duty of fair representation to present her side of the story. Without evidence that the Union breached its duty handling her grievance, Calderone cannot state a due process claim on

this basis. *See Vaca v. Sipes*, 386 U.S. 171, 186 (1967); *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 400 (7th Cir. 2015).

Additionally, Calderone objects to the fact that she has not yet received back pay or otherwise been made whole. She "wants money. That's what the due process clause does *not* guarantee; the federal entitlement is to process, not to a favorable outcome." *Simmons v. Gillespie*, 712 F.3d 1041, 1044 (7th Cir. 2013); *see also Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 321 (1985) ("[T]he fundamental fairness of a particular procedure does not turn on the result obtained in any individual case …."); *Michalowicz*, 528 F.3d at 534 (stressing that "the relevant constitutional question is whether sufficient state-law protections *exist,* not whether sufficient protections were *afforded*").

It is a far cry from bizarre, as Calderone sees it, to require her to either take advantage of the available post-deprivation remedies or illustrate how exactly those remedies are inadequate. Calderone does not challenge the fundamental fairness of the remedies afforded her under the collective bargaining agreement with the City; instead, she thinks the City has not held up its end of the deal. *See, e.g.*, *Garcia v. Kankakee Cnty. Hous. Auth.*, 279 F.3d 532, 535 (7th Cir. 2002). The Constitution leaves such qualms about substance, as opposed to process, to state law. *See Shegog v. Bd. of Educ. of City of Chicago*, 194 F.3d 836, 838 (7th Cir. 1999). The district court properly dismissed this claim.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.